UNITED STATES of America, Appellee,

v.

Peter NOONE, Defendant, Appellant.

No. 89–1691.

United States Court of Appeals, First Circuit.

Heard March 7, 1990.

Decided Sept. 6, 1990.

Owen S. Walker, Federal Defender Office, for defendant, appellant.

Mary Elizabeth Carmody, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., was on brief for the U.S.

Before CYR, Circuit Judge, COFFIN and BOWNES, Senior Circuit Judges.

CYR, Circuit Judge.

Appellant Peter Noone was convicted of conspiring to destroy property belonging to the Plaza Auto Clinic in Chicopee, Massachusetts, and aiding and abetting its destruction, by means of an explosive device, under 18 U.S.C. §§ 2, 371 and 844(i). Noone asserts on appeal that the district court mistakenly denied his motion to dismiss the indictment for failure to comply with the Speedy Trial Act of 1974, as amended, 18 U.S.C. §§ 3161–3174, misinformed the veniremen on voir dire, misinstructed the jury, and erroneously overruled his objection to a leading question. We affirm.

## I. *Speedy Trial Act Claim*

On February 17, 1988, a federal grand jury indicted Noone and four others in connection with the bombing of the Plaza Auto Clinic. Noone's first appearance before a judicial officer in the District of Massachusetts occurred on July 1, 1988, when a magistrate continued the initial pretrial detention hearing to permit Noone to obtain counsel on Noone's representations that he is dyslexic and has difficulty with oral communication. Detention was ordered pending further hearing. Notwithstanding Noone's assurances that he would retain counsel, he appeared without counsel on July 6 and again on July 13. On July 13, prompted by Noone's unusual behavior on that occasion and at previous appearances, the government filed a motion for psychiatric examination and for determination of Noone's competency to stand trial. Hearing on the motion was deferred pending the appearance of Noone's new counsel. On July 14 the magistrate ordered detention pending trial. The next day the government filed a motion for severance, which was allowed on July 18.

At the July 28 hearing on the motion for psychiatric examination under 18 U.S.C. § 4247(b), *see infra* note 7, Noone was represented by court-appointed counsel, Stewart Graham, Esq. On July 29 the magistrate ordered that Noone undergo examination to determine criminal responsibility and competency to stand trial. When Noone finally arrived at Butner Correction-

al Center on September 8, 1988, he refused to cooperate in the examination, which necessitated an extension of the examination period from October 23 until November 22. On November 23, the authorities at Butner notified the United States Marshals Service that Noone would be released for return to Massachusetts. The record does not indicate when Noone left Butner or when he arrived in Massachusetts, only that he remained at Butner on December 19 and that he again appeared before a magistrate in the District of Massachusetts on January 6, 1989.

On January 6, 1989, Noone orally requested the magistrate to reconsider the pretrial detention order. Attorney Graham requested leave to withdraw as counsel, citing Noone's refusal to cooperate and Noone's threats of legal action if Graham continued to represent him. The magistrate described Noone's behavior as an obvious "attempt to disrupt and manipulate." Due to his dyslexia, Noone was not permitted to proceed without counsel, and the magistrate directed Noone to retain counsel or to accept representation by the federal defender. Noone ultimately decided that Graham should continue to represent him throughout the reopened pretrial detention proceedings. Noone agreed to retain counsel thereafter.

Three more detention hearings were held before the magistrate, and on February 2 the district court ordered Noone detained pending trial. Graham was allowed to withdraw as counsel. The magistrate ordered Noone to appear for arraignment, with replacement counsel, on February 14. Instead, Noone appeared without counsel, which the magistrate described as "an unconscionable effort ... to delay the proceedings." The magistrate refused to allow Noone to proceed *pro se,* and the arraignment was continued. On March 6,

Noone was represented by the federal defender, but refused to enter a plea, and the magistrate directed the entry of a "not guilty" plea.

Various discovery motions were filed in behalf of Noone on March 13. On March 20 Noone personally filed objections to the manner in which the magistrate had conducted the arraignment. These objections were resolved by the district court on April 11. On April 12 the government objected to Noone's discovery motions, which were decided April 26.

On May 16 Noone moved to dismiss the indictment pursuant to the Speedy Trial Act. The district court denied the motion on May 22, the first day of trial. Due to the fact that the "defendant's behavior, including his refusal to accept or retain counsel, was the major factor in the delay," the district court held that the seventy-day pretrial period permitted under the Speedy Trial Act did not start running until the arraignment on March 6, 1989.[1]

█ Under the Speedy Trial Act, trial was required to begin within seventy *nonexcludable* days after July 1, 1988, the date Noone first appeared before a judicial officer in the District of Massachusetts.

> In any case in which a plea of not guilty is entered, the trial of a defendant charged in an ... indictment ... shall commence within seventy days ... from the date the defendant has appeared before a judicial officer of the court in which such charge is pending.

18 U.S.C. § 3161(c)(1). Thus, Noone's timely motion to dismiss must be allowed if he can establish that more than seventy nonexcludable days elapsed during the 325-day period from his first appearance on July 1, 1988, to the commencement of trial on May 22, 1989. *Id.* § 3162(a)(2). There is agreement that at least 136 days are

---

1. Alternatively, the district court found that "it would be unreasonable to apply Speedy Trial Act limits" in these circumstances.

 [T]here was no violation of the Speedy Trial Act in light of the novel questions of fact and law raised by defendant's behavior. *See* 18

 U.S.C. § 3161(h)(8)(B)(ii). Noone's adamant refusal to retain counsel, his efforts to have a non-lawyer represent him, and his unwillingness to enter a plea have all directly or indirectly encouraged delay about which the defendant cannot now complain.

excludable[2] and 25 days nonexcludable,[3] leaving the excludability of 164 days at issue. We conclude that 270 days were excludable under section 3161(h)(1)[4] and that no more than 55 nonexcludable days elapsed before the commencement of trial.

### Pre-arraignment Period (July 1, 1988—March 6, 1989)

#### (a) Pre–Butner Phase (July 1–29, 1988)

■ Noone concedes that the July 1–18 period is excludable as "delay resulting from any pretrial motion," 18 U.S.C. § 3161(h)(1)(F), due to the pendency of the motions for pretrial detention and severance. Noone disputes the excludability of the ensuing eleven days as "delay resulting from any proceeding, including any examinations, to determine the mental competency ... of the defendant," *id.* § 3161(h)(1)(A). Noone's contention is based on an erroneous assumption that the period of excludable delay under section 3161(h)(1)(A) does not begin until entry of the order of commitment for examination. Instead, the filing of the motion to commit, on July 13, activated the automatic exclusion under section 3161(h)(1)(F). Moreover, it has been held that the section 3161(h)(1)(A) exclusion itself begins when a motion to determine competency is filed. *See, e.g., United States v. Howell,* 719 F.2d 1258, 1262 (5th Cir.1983), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984). *See also* Committee on the Admin-

istration of the Criminal Law, Judicial Conference of the United States, *Guidelines to the Administration of the Speedy Trial Act of 1974, as Amended* ["STA Guidelines"], at 30. Thus, the entire period from July 1 through July 29 was excludable.

#### (b) Butner Phase (July 30, 1988—January 6, 1989)

■ The entire period from July 30, 1988, through January 6, 1989, when the magistrate ruled that Noone was competent to stand trial, is excludable under 18 U.S.C. § 3161(h)(1)(A), unless, as Noone vigorously asserts, there were impermissible delays in (1) transporting him to or from Butner and (2) conducting the examination at Butner.

##### (i) Transportation to Butner

■ Section 3161(h)(1)(H) excludes "delay resulting from transportation ... to and from places of examination or hospitalization, except that any time consumed in excess of ten days from the date an order of removal or an order directing such transportation, and the defendant's arrival at the destination shall be presumed unreasonable." 18 U.S.C. § 3161(h)(1)(H). After the magistrate ordered the examination, 40 days elapsed before Noone arrived at Butner.[5] Thus, under section 3161(h)(1)(H), 30 days are presumed to have elapsed due to unreasonable delay and to be nonexclud-

**2.** The parties agree that the following periods of delay are excludable: 17 days (July 2–18, 1988), 18 U.S.C. § 3161(h)(1)(F); at least 65 days (during the 162–day interval from July 29, 1988 to January 6, 1989), *id.* §§ 3161(h)(1)(A) & 3161(h)(1)(H); two days (February 1, 2, 1989), *id.* § 3161(h)(1)(F); 45 days (March 13 to April 26, 1989), *id.*; and seven days (May 16–22, 1989), *id.*

**3.** The parties agree that the following periods are not excludable: six days (March 7–12, 1989) and 19 days (April 27 to May 15, 1989).

**4.** Section 3161(h)(1) exclusions are automatic. Therefore, the fact that the district court did not contemporaneously order these exclusions is immaterial. *See, e.g., United States v. Jodoin,* 672 F.2d 232, 238 (1st Cir.1982) ("The fact that neither the trial judge nor his speedy trial clerk passed on whether this time was excludable [is]

beside the point."); *United States v. Elkins,* 795 F.2d 919, 923 (11th Cir.), *cert. denied,* 479 U.S. 952, 107 S.Ct. 443, 93 L.Ed.2d 391 (1986).

**5.** Section 3161(h)(1)(H), rather than § 3161(h)(1)(A) (relating to delay "from any *proceeding* ... to determine the mental competency ... of the defendant," 18 U.S.C. § 3161(h)(1)(A) (emphasis added)), controls the excludability of this period of delay. Any other interpretation would render mere surplusage the specific reference in subparagraph (h)(1)(H) to transportation "to and from places of examination or hospitalization." *Cf.* STA Guidelines, at 31 ("unreasonable delay in transporting a defendant to or from an institution at which the examination takes place may serve to reduce the amount of excludable time" under § 3161(h)(1)(A)).

able.[6] As the government offers no explanation of the transportation delay, it has failed to rebut the presumption of nonexcludability. *See, e.g., United States v. Taylor,* 821 F.2d 1377, 1384 (9th Cir.1987), *rev'd on other grounds,* 487 U.S. 326, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988); *United States v. Jervey,* 630 F.Supp. 695, 697 (S.D. N.Y.1986) ("[O]rdinary institutionalized delay is not an excuse. When this Act was passed Congress knew all about the customs and practices of the prison bus.")

(ii) *Butner Examination*

■ Noone contends that the maximum exclusion for delay attendant to psychiatric examinations conducted under 18 U.S.C. § 4247(b)[7] is 45 days. We do not address Noone's contention, however, since the court ordered the commitment to Butner for two purposes: evaluation of sanity (criminal responsibility) at the time of the offense, *see id.* § 4242, and competency to stand trial, *see id.* § 4241.[8] Section 4247(b) permits the court to order a 45–day psychiatric examination for the determination of a defendant's sanity at the time of the offense (criminal responsibility), *id.* § 4242, and to extend the examination period for up to 30 additional days for good cause.

When the initial 45–day examination period expired on October 24, Butner requested a 30–day extension on account of Noone's refusal to cooperate, which the court granted without objection. "Good cause" exists where "additional time is necessary to observe and evaluate." *Id.* § 4247(b). Noone's recalcitrance necessitated the additional time period to observe and evaluate. The examinations were completed within the 75–day period. Assuming, without deciding, that Speedy Trial Act exclusions for delays occasioned by psychiatric examinations are subject to the time limits in section 4247(b), the entire period of time Noone was at Butner for psychiatric examinations was nonetheless excludable under section 3161(h)(1)(A).

(iii) *Transportation from Butner to Massachusetts*

■ Although Butner officials notified the U.S. Marshals Service on November 23 that Noone was available for return to Massachusetts, he remained at Butner at least until the Butner examination report was received by the magistrate on December 19.[9] The period November 23 to December 19 is nonetheless excludable under section 3161(h)(1)(A), since subparagraph

---

**6.** On January 6, 1989, the magistrate excluded the entire period between July 29, 1988 and January 6, 1989, under § 3161(h)(1)(A). Stressing that subparagraph (h)(1)(H) merely creates a presumption of unreasonable delay, the government contends that the magistrate's January 6 order necessarily determined the entire transportation delay period reasonable and that Noone waived his right to raise the issue by failing to object to the magistrate's order. *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); *United States v. Escoboza–Vega,* 678 F.2d 376 (1st Cir.1982). We reject the government's contention as the record is devoid of any explanation of the delay which could rebut the statutory presumption of unreasonableness.

**7.** Section 4247(b) in part provides:
For the purposes of an examination pursuant to an order under section 4241, 4244, or 4245, the court may commit the person to be examined for a reasonable period, but not to exceed thirty days, and under section 4242, 4243, or 4246, for a reasonable period, but not to exceed forty-five days, to the custody of the Attorney General for placement in a suitable facility. Unless impracticable, the psychiatric or psychological examination shall be con-

ducted in the suitable facility closest to the court. The director of the facility may apply for a reasonable extension, but not to exceed fifteen days under section 4241, 4244, or 4245, and not to exceed thirty days under section 4242, 4243, or 4246, upon a showing of good cause that the additional time is necessary to observe and evaluate the defendant.
18 U.S.C. § 4247(b).

**8.** At the request of defense counsel, the magistrate ordered a criminal responsibility evaluation.
COURT: Are you saying the criminal responsibility should be included in that?
MR. GRAHAM: I think it should be. Since he's going to be there and there are going to be individuals there testing him he may as well have it done.
Butner officials likewise interpreted the court order as requiring both types of examination.

**9.** It is unnecessary to consider the defendant's contention that all time in excess of ten days, consumed in transporting him from Butner to Massachusetts, is nonexcludable under subparagraph H. The contention assumes, without record basis, that Noone was in transit more than ten days. All the record reveals is that he

(h)(1)(A), at a minimum, excludes a reasonable period pending delivery of the report to the court. *See United States v. Howell,* 719 F.2d at 1261 (excluding time through filing of report). *See also* STA Guidelines, at 30. Moreover, the time reasonably required to consider the psychiatric examination report, and to schedule and conduct the hearing—in this case the 17–day period (with two holidays and four weekend days intervening) between December 19, 1988 and January 6, 1989—was excludable. *See United States v. Jones,* 801 F.2d 304, 316 (8th Cir.1986) (excluding time through competency hearing).[10]

(c) Proceedings on Reconsideration of Detention Orders (January 6—February 2, 1989)

▮ The entire 28 day interval between Noone's oral request (on January 6, 1989) for reconsideration of the July 1988

pretrial detention order and its denial on February 2, 1989 was excludable as "delay resulting from any pretrial motion." 18 U.S.C. § 3161(h)(1)(F).[11] The time elapsed pending disposition of motions for review of pretrial detention orders is excludable under section 3161(h)(1)(F). *See, e.g., United States v. Castellano,* 848 F.2d 63, 65 (5th Cir.1988) (excluding ten days between filing and disposition of motion to revoke detention order); *United States v. Bowers,* 834 F.2d 607, 609 (6th Cir.1987) (excluding time between filing and allowance of motion for pretrial detention). *See also United States v. Wilson,* 835 F.2d 1440, 1443 (D.C.Cir.1987) (*all* types of pretrial motions are covered by § 3161(h)(1)(F)).[12]

(d) Arraignment Delays (February 2—March 6, 1989)

▮ The detention proceedings were completed on February 2, 1989. On that

---

was still at Butner on December 19, 1988, and that he was in Massachusetts on January 6, 1989. Without any evidence as to when he left Butner, or when he arrived in Massachusetts, we do not assume that Noone was in transit beyond the ten-day period presumed reasonable under subparagraph H.

**10.** There is serious doubt that exclusions under § 3161(h)(1)(A) must meet a reasonableness test. *See Henderson v. United States,* 476 U.S. 321, 330, 106 S.Ct. 1871, 1876–77, 90 L.Ed.2d 299 (1986) ("all time between the filing of a motion and the conclusion of the hearing on that motion [is excludable under § 3161(h)(1)(F)], whether or not a delay in holding that hearing is 'reasonably necessary'"). Further, Noone does not contend that there was any unreasonable delay in scheduling the competency hearing after the psychiatric report was received by the court, only that the transportation delay from Butner was excessive. Moreover, even assuming unnecessary delay in scheduling the competency hearing, there can be no doubt whatever that Noone was brought to trial within the seventy day period prescribed by the Speedy Trial Act.

**11.** We reject Noone's formalistic contention that only a written motion can activate the exclusionary provisions of subparagraph (h)(1)(F). *See, e.g., United States v. Cobb,* 697 F.2d 38, 43 (2d Cir.1982) (term "filing," in § 3161(h)(1)(F), applies to oral motion); *United States v. O'Bryant,* 775 F.2d 1528, 1532 (11th Cir.1985) (excluding delay in resolution of oral discovery motion); *United States v. Richmond,* 735 F.2d 208, 212 (6th Cir.1984) (oral motion for continuance); STA Guidelines, at 36((h)(1)(F) exclusion

begins on "date the motion is filed or made orally"); *cf. United States v. Jorge,* 865 F.2d 6, 11–12 (1st Cir.) (Although government request for laboratory reports was "not a motion, ... [b]ecause we believe it is appropriate to treat the document as at least equivalent to a pretrial motion, we hold that it falls within subsection (F) of § 3161(h)(1)."), *cert. denied,* —— U.S. ——, 109 S.Ct. 1762, 104 L.Ed.2d 198 (1989).

**12.** The delay occasioned by the need to hear and consider the request for reconsideration was excludable also as an "other proceeding." 18 U.S.C. § 3161(h)(1). *See Jodoin,* 672 F.2d at 238 (excluding time between oral motion for time to file suppression motion and actual filing of written motion). At the detention hearing, the magistrate stated as follows:

I want to just observe on the record that I think the time expended in connection with the reconsideration of the release issue is excludable time. There is no, under the Speedy Trial Act, there is no formal motion to reconsider on the docket. But my original detention order was without prejudice to a motion to reconsider, and I consider though, to use that word, that right now I have before me an oral motion to reconsider the conditions of release which should stay the running of the speedy trial clock.

And *until that issue is resolved* I don't think we're going to be expending *any* speedy trial days.

. . . .

So I consider all this time to be excludable under the Speedy Trial Act.
(emphasis added).

date the magistrate scheduled arraignment for February 14. Due to a series of continuances necessitated by defendant's failure to obtain counsel, arraignment was not held until March 6.[13] The entire delay was occasioned, directly or indirectly, by Noone's refusal to cooperate with counsel or to obtain replacement counsel. The magistrate reasonably refused to permit Noone to proceed without counsel due to Noone's self-proclaimed difficulties in oral communication. Although Noone was well aware that replacement counsel would have to be obtained before the arraignment could proceed, he brought the proceedings to a virtual standstill by failing to obtain counsel, occasioning the entire period of delay about which he presently complains.

 The Speedy Trial Act is designed to serve the public interest and the interests of the accused by requiring promptness in criminal proceedings. It is not a contrivance for occasioning expedient dismissals of criminal proceedings by fostering unnecessary delays. Its salutary provisions are not amenable to the perverse manipulation attempted in the present case. Thus, the Speedy Trial Act allows for the exclusion of delays occasioned by a defendant's unnecessary prolongation of the proceedings. As an example directly in point, in *United States v. Bowers*, 834 F.2d 607, 610 (6th Cir.1987), the Sixth Circuit excluded, under subparagraphs (h)(1) and (h)(3), a three-day delay occasioned by the need to reschedule an arraignment due to the failure of the defendant and defense counsel to appear at a previously scheduled arraignment. Similarly, defendant Noone's dilatory failure to obtain counsel, coupled with the court's determination that Noone was unable to represent himself, unnecessarily prolonged these arraignment proceedings. *See also United States v. Pringle*, 751 F.2d 419, 432–34 (1st Cir.1984)

(excluding delay occasioned by defendant's invalid waiver of rights under Speedy Trial Act). Accordingly, the entire period between February 2 and March 6, 1989, was excludable under section 3161(h)(1).

Thirty non-excludable days elapsed during the pre-arraignment period. As the parties are in agreement that 25 nonexcludable days elapsed during the post-arraignment period, the defendant was brought to trial well within the 70-day period required by 18 U.S.C. § 3161(c)(1). The district court correctly denied the motion to dismiss.

## II. Jury Instruction on Reasonable Doubt

The second assignment of error challenges the instruction on reasonable doubt.

A reasonable doubt is a doubt based upon reason and common sense—the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt must, therefore, be of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important and vital matters relating to his own affairs.

At the conclusion of the jury charge, the defendant seasonably objected.

I object to that part of the reasonable doubt instructions where the Court said 'proof beyond a reasonable doubt must therefore be proof of such a convincing character that a juror [sic] would not hesitate to act upon it in the most important affairs of a juror's [sic] life.'

The defendant relies on cases in which we have disapproved the practice of "defining reasonable doubt in terms of decisions relating to important affairs in a juror's life." *See Dunn v. Perrin*, 570 F.2d 21, 24 (1st Cir.) ("comparison of reasonable doubt

---

**13.** The government argues for an "ends of justice" exclusion under § 3161(h)(8)(A). Such exclusions require reasonably contemporaneous "findings that the ends of justice outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(8)(A). Thus, the trial court must be satisfied at least that the continuances served the ends of justice. *See Elkins*, 795 F.2d at 924; *United States v.*

*Frey*, 735 F.2d 350 (9th Cir.1984); *United States v. Richmond*, 735 F.2d 208 (6th Cir.1984). It is not apparent that the magistrate engaged in the calculus contemplated by § 3161(h)(8)(A), even though the circumstances might have supported such a finding. *See id.* § 3161(h)(8)(B)(i), (ii), (iv). Therefore, we address the excludability of this period of delay below. *See infra* p. 28.

in criminal cases with the standard employed by jurors to make even the most significant decisions in their daily lives has been criticized for its tendency to trivialize the constitutionally required burden of proof"), *cert. denied*, 437 U.S. 910, 98 S.Ct. 3102, 57 L.Ed.2d 1141 (1978); *United States v. Sorrentino*, 726 F.2d 876, 882–83 (1st Cir.1984) (charge defining proof beyond a reasonable doubt as "proof that you would not hesitate to act and rely on in the most important of your own affairs," not "plain error"); *United States v. Cranston*, 686 F.2d 56, 62 (1st Cir.1982) (same); *United States v. Drake*, 673 F.2d 15, 20 (1st Cir.1982) (no "reversible error" in charge comparing reasonable doubt standard "with the process employed by a juror in making important decisions in his or her own life.").

Federal Rule of Criminal Procedure 30 states:

> No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, *stating distinctly* the matter to which that party objects and *the grounds of the objection.*

Fed.R.Crim.P. 30 (emphasis added). Noone complains that it was reversible error "to trivialize the constitutionally required burden of proof," Appellant's Brief at 35 (quoting *Dunn*, 570 F.2d at 24), by comparing the "reasonable doubt" standard to the decisional standard normally applied in the most important affairs of a *juror's* life. The challenged jury instruction, on the other hand, likens "proof beyond a reasonable doubt" to proof "of such convincing character that a *reasonable person* would not hesitate to rely and act upon it in the most important and vital matters relating to his own affairs."

We have criticized instructions which compare "reasonable doubt" to the decisional standard used by individual jurors in their own affairs. *See, e.g., Sorrentino*, 726 F.2d at 882–83; *Cranston*, 686 F.2d at 62; *Drake*, 673 F.2d at 20; *Dunn*, 570 F.2d at 24. The momentous decision to acquit or convict a criminal defendant cannot be compared with ordinary decisionmaking without risking trivialization of the constitutional standard. *See, e.g., Dunn*, 570 F.2d at 24. We have yet to suggest, however, that equivalent constitutional concerns are occasioned by analogizing reasonable doubt to the decisional standard employed by the "reasonable person" customarily hypothesized by courts of law as an objective decisionmaker less vulnerable to subjective contamination than the "flesh and blood" variety. Nonetheless, we admonish against the use of any such instruction, as an altogether unnecessary embellishment that risks juror misunderstanding of the reasonable doubt standard.

The present objection misstated the challenged portion of the reasonable doubt instruction, articulated no basis, and cited no authority. Therefore, as the reasonable doubt instruction did not even contain the language claimed to be erroneous by defendant, the objection asserted on appeal is without merit.[14]

### III. *Jury Instruction on Evidence of Flight*

The third claim on appeal challenges the district court's rejection of Noone's requested jury instruction on evidence of flight.

---

**14.** Aside from our frequent precatory alerts against attempting to embellish the definition of "reasonable doubt," *see, e.g., United States v. Campbell*, 874 F.2d 838, 843 (1st Cir.1989), the primary teaching in our cases is directed against any impermissible shifting of the burden of persuasion which might result from likening reasonable doubt to doubt which would cause one *to act*, rather than *hesitate to act*. *See Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 138, 99 L.Ed. 150 (1954); *Dunn*, 570 F.2d at 24. The district court's definitions of "reasonable doubt" and "proof beyond a reason-able doubt" could not have occasioned any impermissible shifting of the government's burden of persuasion to the defendant in the present case. The district court defined *reasonable doubt* as "the kind of doubt that would make a reasonable person hesitate to act," which we have approved, *see, e.g., United States v. Munson*, 819 F.2d 337, 346 (1st Cir.1987), and defined *proof beyond a reasonable doubt* as proof "of such a convincing character that a reasonable person would not hesitate to rely and act upon it," the converse of the approved instruction on reasonable doubt.

You should be cautioned against attaching too much significance to supposed evidence of flight. People who are entirely innocent sometimes flee from the scene of a crime for a multitude of reasons, including, for example, hesitation to confront even false accusations, fear that they will be unable to prove their innocence, or protection of a guilty party.[15]

The district court declined the request, but instructed the jury as follows:

[Y]ou have heard evidence that once the arrests for the bombing began, Peter Noone may have left Massachusetts, possibly to avoid detection by law enforcement officers. If you believe this evidence, you may consider these actions as displaying an awareness of consciousness of guilt on behalf of Peter Noone regarding the charges in the indictment.

While this evidence is not sufficient in and of itself to determine guilt, the law allows you to consider such evidence in your deliberations in deciding the issue. However, you are not required to make the assumption that these acts, if believed, evidence an awareness of guilt. *There may be completely innocent and proper reasons why Peter Noone left Massachusetts*, if you find that he did, *which may have nothing to do with the bombing of the Plaza Auto Clinic. It is completely up to you, the jury, to assess the weight, if any, you wish to give to this evidence.*

(emphasis added). The defendant contends that the requested instruction conforms with the defense theory that he fled the jurisdiction, not to avoid capture, but for entirely "innocent" reasons, including his desire not to testify against his brother, Kevin Noone. While we agree, as the district court obviously did, that the defendant was entitled to an instruction on evidence of flight, we are satisfied that he was not entitled to the requested instruction.

The defendant contended that he fled the *jurisdiction* to avoid having to testify against his brother. The requested instruction relates to flight from the *scene* of the crime. Moreover, only one of the three examples of "innocent" reasons for flight included in the requested instruction ("protection of a guilty party") could be considered consistent with defendant's theory. Yet even as to that theory it is well settled that the court "need not give instructions in the precise form or language requested by the defendant." *United States v. Beltran*, 761 F.2d 1, 11 (1st Cir.1985); *Gibson*, 726 F.2d at 874; *United States v. Morris*, 700 F.2d 427, 433 (1st Cir.1983); *see also United States v. Winter*, 663 F.2d 1120, 1146 (1st Cir.1981) ("A trial judge is under no obligation to deliver a requested instruction verbatim."), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983). Rather, it is sufficient that the court's instruction "communicate to the jury the substance of the request." *Winter*, 663 F.2d at 1146.

Although ordinarily a defendant is entitled to a requested instruction on his theory of the case, *United States v. Gibson*, 726 F.2d 869, 874 (1st Cir.), *cert. denied*, 466 U.S. 960, 104 S.Ct. 2174, 80 L.Ed.2d 557 (1984), its refusal is not ground for reversal where the court's instruction substantially covers the request, *see id.; Morris*, 700 F.2d at 433. The district court gave the jury a firm cautionary instruction on evidence of flight, emphasizing in general terms that there may be many innocent reasons for flight. Thus, the substance of the requested instruction was thoroughly covered. The court effectively disabused the jury of any notion that evidence of flight is either sufficient, standing alone, to support a determination of guilt, or consistent only with an inference of guilt. Without highlighting or commenting on Noone's contention that he left Massachusetts to avoid testifying against his brother, *see, e.g., United States v. Lizotte*, 856 F.2d 341, 344 (1st Cir.1988) ("It is well within the discretion of the district court to comment on the evidence."); *Ag-*

---

15. The quoted language is from *United States v. Hernandez–Bermudez*, 857 F.2d 50, 54 (1st Cir. 1988), where we discussed the potential prejudicial effect of evidence of flight from a crime scene.

*garwal v. Ponce School of Medicine*, 837 F.2d 17, 22 (1st Cir.1988) ("it is within the trial judge's discretion to comment on the facts and evidence"), the district court set out an appropriate legal framework for jury consideration of the contention that Noone fled the jurisdiction for entirely innocent reasons. There was no error in the challenged instruction.

## IV. *Sixth Amendment Right of Confrontation*

Noone next contends that the district court erred by refusing to strike the testimony of Steven Sadusky, an accomplice who successfully asserted a fifth amendment privilege against self-incrimination during cross-examination by defense counsel. Sadusky, previously convicted and sentenced pursuant to a plea agreement, was called to testify in behalf of the government about events on the night of the bombing.

On direct examination Sadusky proved to be a very recalcitrant witness. He told the jury that he had pled guilty (under "threats, duress and coercion") to criminal charges arising out of the same bombing incident. Initially, Sadusky asserted a fifth amendment privilege and utterly refused to testify about the bombing incident. Although the court rejected the claim of privilege with respect to crimes of which Sadusky had already been convicted, his testimony remained evasive, equivocal, and irreconcilable with earlier sworn statements implicating Noone in the bombing.

The government then impeached Sadusky, using his prior inconsistent testimony before the federal grand jury and at the trial of defendant's brother, as well as Sadusky's sworn statement to a government agent. Thus confronted, Sadusky at times elected to conform his trial testimony to his former statements. At other times, he disavowed or qualified his former statements, explaining that on those earlier occasions he was "fed" or "told" what to say.

Defense counsel conducted a lengthy cross-examination on Sadusky's versions of the events on the night of the bombing, thoroughly exposing all matters affecting Sadusky's credibility. When Sadusky was asked whether his earlier sworn statements were lies, however, he declined to answer. The district court sustained Sadusky's renewed claim of privilege, and defense counsel moved to strike all of Sadusky's testimony. The court denied the motion, and defense counsel resumed cross-examination concerning the events on the night of the bombing, Sadusky's earlier inconsistent statements, and his motives and biases.

The Sixth Amendment to the United States Constitution guarantees an accused the right " 'to be confronted with the witnesses against him.' This has long been read as securing an adequate opportunity to cross-examine adverse witnesses." *United States v. Owens*, 484 U.S. 554, 557, 108 S.Ct. 838, 841, 98 L.Ed.2d 951 (1988) (quoting U.S. Const.Amend. VI); *see also Kentucky v. Stincer*, 482 U.S. 730, 736, 107 S.Ct. 2658, 2662, 96 L.Ed.2d 631 (1987); *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). Thus, "restrictions imposed by law or by the trial court on the scope of cross-examination ... may 'effectively emasculate the right of cross examination itself,' " *Delaware v. Fensterer*, 474 U.S. 15, 18–19, 106 S.Ct. 292, 293–94, 88 L.Ed.2d 15 (1985) (per curiam) (quoting *Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (1968)); *see also Davis v. Alaska*, 415 U.S. 308, 317–18, 94 S.Ct. 1105, 1110–11, 39 L.Ed.2d 347 (1974) (confrontation clause violated by court's bar on inquiry into prosecution witness's probationary status as juvenile delinquent which entirely foreclosed defense effort to disclose potential bias).

Our decisions recognize that trial court rulings that prevent the effective exercise of a defendant's right to cross-examine adverse witnesses, including a government witness who asserts a privilege against self-incrimination, require exclusion of some or all of the witness's testimony. *See, e.g., United States v. Stubbert*, 655 F.2d 453, 457–58 (1st Cir.1981) (witness's refusal to name narcotics buyers did not necessitate striking testimony, where issue was collateral). Nevertheless, a defendant's right to cross-examine adverse wit-

nesses is not unlimited. "The confrontation clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *United States v. Owens*, 484 U.S. at 559, 108 S.Ct. at 842 (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739, 107 S.Ct. 2658, 2664, 96 L.Ed.2d 631 (1987) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985))) (emphasis in original).

> [N]ot every invocation of the fifth amendment privilege against self incrimination results in a denial of the sixth amendment right of confrontation and requires striking the witness's testimony; a distinction is drawn between direct and collateral matters. While the line between these two categories may not always be clear, the *essential inquiry must finally be whether defendant's inability to make the inquiry created a substantial danger of prejudice by depriving him of the ability to test the truth of the witness's direct testimony.*

*Turner v. Fair*, 617 F.2d 7, 10 (1st Cir. 1980) (quoting *United States v. Rogers*, 475 F.2d 821, 827 (7th Cir.1973)) (emphasis added); *see also United States v. Kimble*, 719 F.2d 1253, 1257 (5th Cir.1983), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984); *United States v. Seifert*, 648 F.2d 557, 562 (9th Cir.1980).

Noone was not prejudiced by the district court ruling sustaining Sadusky's claim of privilege, since the ruling did not inhibit effective cross-examination. Defense counsel effectively exposed Sadusky's conflicting versions of the events relating to the bombing incident from which the criminal charges against the defendant stemmed. *Compare United States v. Cardillo*, 316 F.2d 606, 613 (2d Cir.) (witness's refusal to disclose name of lender foreclosed answers which "might have established untruthfulness with respect to the specific events of the crime charged"), *cert. denied*, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963). Defense counsel took full and effective advantage of the unrestricted opportunity to cross-examine Sadusky concerning the circumstances of the crime, as well as other matters to which Sadusky testified on direct examination, and to explore, at considerable length, Sadusky's motives, biases and credibility. The defendant was entitled to no more. *See United States v. Garcia–Rosa*, 876 F.2d 209, 237 (1st Cir.1989) ("Once the defendant has been afforded a reasonable opportunity to question a witness' veracity and motivation, the trial judge enjoys broad discretion in determining the scope or the extent of cross-examination.")

Witness credibility is the fodder of effective cross-examination. Yet, here, the only constraint on cross-examination was that Sadusky was not compelled to *admit* to perjury. The defense, as well as the prosecution, exposed Sadusky's motives, biases and inconsistencies so effectively that a testimonial admission to perjury by Sadusky would have been superfluous. The district court correctly declined to strike Sadusky's testimony.

## V. *Voir Dire*

■ We introduce the present discussion with an affirmation that effective voir dire must expose potential bias and prejudice in order to enable litigants to facilitate the impanelment of an impartial jury through the efficient exercise of their challenges. *Schlinsky v. United States*, 379 F.2d 735, 738 (1st Cir.) ("purpose of the voir dire is to ascertain disqualifications"), *cert. denied*, 389 U.S. 920, 88 S.Ct. 236, 19 L.Ed.2d 265 (1967); *United States v. Blount*, 479 F.2d 650, 651 (6th Cir.1973) ("primary purpose of the voir dire is to make possible the empaneling of an impartial jury through questions that permit the intelligent exercise of challenges by counsel"). We digress to these fundamental considerations because our review indicates that the government's overzealous voir dire requests led the district court into the inadvertencies complained of on appeal.[16]

The defendant contends that a new trial is required by reason of certain ambiguous

---

16. *See infra* notes 16 & 18.

inquiries which were put to the veniremen on voir dire concerning their views toward plea agreement testimony and the testimony of convicted felons.

### (a) Plea Agreement Testimony

The court inquired of the veniremen as follows:

> Some of the witnesses in this case are co-defendants who have entered their pleas of guilty and have been sentenced by the Court. They will be testifying pursuant to plea agreements with the United States of America.
>
> . . . .
>
> Would you be prejudiced against any defendant [sic] because of a plea agreement that would be entered into between the government and the witness? [17]

The defendant argues that the veniremen were given an incorrect impression that "witnesses ... testifying pursuant to plea agreements were to be treated no differently from other witnesses." *See United States v. Dailey,* 759 F.2d 192, 200 n. 8 (1st Cir.1985) (approving charge permitting jury consideration of plea agreements in weighing witness credibility).

■ Although these inquiries may have left prospective jurors in doubt, at the time, whether plea agreement testimony is entitled to more, less, or the same, credence as other testimony, the district court clarified the matter in its final jury charge.

> Now, you should scrutinize the testimony of accomplices, and especially co-defendants who have entered into plea agreements with the Government with great

care and great caution in determining the amount of credibility to be given such a witness. More care and caution is called for when considering the testimony of someone who may have a vested interest in the trial than that of an ordinary witness.

> Co-defendants who have entered into plea bargain agreements with the Government may have feelings about the Defendant on trial that affects their testimony. You should not vote to convict a defendant solely on unsupported testimony of an accomplice who has entered into a plea bargain agreement unless you believe beyond a reasonable doubt that the accomplice is telling the truth.
>
> On the other hand, you should not hold any biases or be prejudiced against the Government because of plea agreements. Use of plea agreements is expressly authorized under the Federal Rules of Criminal Procedure.

The jury instruction at the end of the trial, alluded to during voir dire, *see supra* note 16, was an entirely correct statement of the law, *see United States v. Silvestri,* 790 F.2d 186, 191–92 (1st Cir.), *cert. denied,* 479 U.S. 857, 107 S.Ct. 197, 93 L.Ed.2d 129 (1986), which cured whatever mistaken impression may have been left at voir dire. Thus, there was no prejudicial error. *See United States v. Hyson,* 721 F.2d 856, 860 (1st Cir.1983) ("no merit" to claim of error based on improper preliminary credibility instruction, where final jury charge included "impeccable" credibility instruction); *cf. United States v. Giry,*

---

**17.** The government submitted the following voir dire request:

> Some of the witnesses in this case are co-defendants who have entered their pleas of guilty and have been sentenced by the Court. They will be testifying pursuant to plea agreements with the United States of America. Will you be inclined to give less weight, or more weight, to the testimony of such witnesses solely because of the fact of the plea agreements?

The district court extemporaneously rephrased its own inquiry several times, as follows, before settling on the version quoted in the text.

> Will you be inclined to give less weight or more weight to the testimony of such witness-

es solely because of the fact of the plea agreements?

> That is a double question, so let me put it to you this way: Based on any plea agreements, would you still be able to give the same type of credibility to the witnesses, as the Court will instruct you at a later point, or will you be prejudiced against that particular plea agreement? That is a double question.
>
> Would you be able to give the same weight as you would to any other witness based on the instructions of this Court regardless of any plea agreement that may be entered into?

At this point defense counsel objected, and the court put the question reproduced in the text.

818 F.2d 120, 133–34 (1st Cir.1987) (jury instruction "significantly reduced" prejudicial impact of prosecutor's misstatements).

### (b) Impeachment by Prior Conviction

▬▬▬▬ The defendant complains about another inquiry posed on voir dire:

Now, some of the witnesses in the case have previously been convicted of crimes in State and/or Federal Courts. That will be revealed to you during the examination or cross examination.

Would you be prejudiced against such a witness because he has, in fact, been convicted in other courts—and I will be instructing you on this in more detail later?

▬▬▬▬ Of course, Federal Rule of Evidence 609(a) specifically permits use of a prior conviction to impeach a witness.[18] The defendant argues that the challenged voir dire inquiry could have led prospective jurors to conclude that a criminal conviction may not be considered in weighing witness credibility.[19] The defendant further contends that the court's failure to follow through on its stated intention to instruct the jury concerning the impeachment of a witness by use of a prior conviction exacerbated the risk of juror misunderstanding, such that the net effect of the two missteps amounted to reversible error.[20]

▬▬▬▬ A prior conviction may be used to impeach a witness and should be considered by the jury in assessing the witness's credibility. *See Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (evidence of prior conviction affords jury basis to infer witness's untrustworthiness, and is, therefore, "a general attack on the credibility of the witness"). Nevertheless, the weight accorded the testimony of the witness remains a matter for jury determination. *See generally United States v. Johnson,* 412 F.2d 753, 756 (1st Cir.1969) (court correctly charged jury that conviction "merely reflects on [witness's] credibility" and that "it is the province of the jury to determine

---

**18.** Evidence Rule 609(a) states in relevant part:

For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during cross-examination....

Fed.R.Evid. 609(a).

**19.** The government submitted the following voir dire request: "Will you be inclined to give less weight or more weight to the testimony of such witnesses solely because of that factor [a prior conviction]?" Voir dire is intended to enable the impanelment of an impartial jury, not a favorable jury. *See United States v. Brunty,* 701 F.2d 1375, 1379 (11th Cir.) ("A [party] is not entitled to a sympathetic jury; merely an impartial one."), *cert. denied,* 464 U.S. 848, 104 S.Ct. 155, 78 L.Ed.2d 143 (1983); *see also* 2 C. Wright, *Federal Practice and Procedure,* § 381, 332–33 (2d ed. 1982). The government's request was unnecessary and induced the confusion and error complained of on appeal.

An outright denial of the government's request would have been appropriate in these circumstances. *See infra* note 19. The district court has broad discretion to determine the content of its questions on voir dire. *See, e.g., Real v. Hogan,* 828 F.2d 58, 62 (1st Cir.1987); *United States v. Collatus,* 798 F.2d 18, 21 (1st Cir.), *cert. denied,* 479 U.S. 993, 107 S.Ct. 594, 93 L.Ed.2d 595 (1986). *See also* Fed.R.Crim.P. 24(a). The district court undoubtedly was trying to temper the government's request by rephrasing it in terms of "prejudice." The defendant, at the time, did nothing to note or correct the court's inadvertence.

**20.** We have never determined that a specific instruction must be given on impeachment by prior conviction absent a request, or that one must be given when requested. As a general rule, "an accused is entitled to an instruction on his theory of defense so long as the theory is a valid one and there is evidence in the record to support it." *United States v. Rodriguez,* 858 F.2d 809, 812 (1st Cir.1988). Nevertheless, it seems clear that refusal to give a specific instruction on impeachment by prior conviction would not amount to reversible error where the court's instructions "substantially covered the issues contained in the requested instruction," *United States v. Angiulo,* 897 F.2d 1169, 1207–08 (1st Cir.1990) (refusal to instruct on effect of prior inconsistent statements on witness's credibility, not reversible error where court instructed that jury alone determines witness credibility and that accomplice and informer testimony must be scrutinized with great care and caution). In the present case, however, where witness credibility was an important element of the defense, and the jury, arguably at least, may have been misled at voir dire, we believe that an instruction on impeachment by prior conviction should have been given, particularly since the court stated its intention to do so.

what weight, if any, should be given such prior conviction as impeachment"); *Rogers v. Rulo*, 712 F.2d 363, 367 n. 3 (8th Cir.) (similar charge held proper), *cert. denied*, 464 U.S. 1046, 104 S.Ct. 719, 79 L.Ed.2d 181 (1983); E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 17.09 (3rd ed. 1977).

■ We note that the challenged voir dire inquiry is but arguably misleading. Prospective jurors would have had to make a series of inferential leaps before their minds could have settled on the misapprehension ascribed by the defendant. First, jurors would have had to treat the *inquiry* as a declaration or directive. Second, even if the court's neutral inquiry were regarded as a directive, it would amount to an admonition that the jury should not be unalterably "prejudiced" against the trustworthiness of the witness's testimony merely on account of the witness's prior conviction and without regard to the other evidence in the case. The court's voir dire inquiry could not fairly be understood as a directive to the jury not to consider the witness's testimony on the basis of all the evidence (including the witness's prior conviction) in disregard of the court's express instructions at the close of all the evidence.[21] The defendant's contention on appeal not only entails a strained interpretation of the voir dire inquiry, but assumes that the jury disregarded the court's later instruction to assess the credibility of every witness in light of all the evidence in the case.

In any event, we conclude that there was no more than a remote prospect of any significant prejudice to the defendant. There were two government witnesses with prior felony convictions. The first, Vincent Iuliano, was the owner of the Plaza Auto Clinic, the premises which were bombed. Iuliano previously was convicted of conspiracy to distribute cocaine. He testified to events that precipitated the bombing, to the bombing, and to receiving two threatening telephone calls from a "Mr. Marlin" (defendant Noone, according to the government), one before the bombing and one afterward.[22] Iuliano's testimony was consistent in all material respects with other evidence, documentary and testimonial, on the same matters. Significantly, apart from telling about the telephone calls from "Mr. Marlin," Iuliano's testimony did not pertain to the seriously contested issues in the case—the defendant's membership in the alleged conspiracy and his direct participation in the bombing.[23]

Three factors minimize the likelihood and the significance of any prejudicial effect from the omitted instruction relating to the testimony of Stephen Sadusky, the only other government witness with a criminal record.[24] First, Sadusky's account of the events on the night of the bombing, particularly as to defendant's direct involvement in those events, was corroborated in all material respects by the testimony of another government witness, Joseph Dalpe.[25] Second, in a related vein, Sadusky was one of five government witnesses who identified the defendant as "Mr. Marlin," the

21. The court instructed the jury as follows:
 You should carefully scrutinize all the testimony given, the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief.
 . . . .
 After making your own judgment, you will give the testimony of each witness such credibility, if any, as you may think it deserves.

22. During the later telephone conversation, which was recorded, played to the jury and admitted into evidence, the caller, who identified himself as "Mr. Marlin," claimed responsibility for the bombing and threatened Iuliano.

23. Iuliano testified that the same person made both of the threatening telephone calls. Iuli-

ano's testimony was corroborated by the Plaza Auto Clinic's receptionist, Gail Batty.

24. Sadusky's testimony for the most part related to events on the night of the bombing. Sadusky also identified defendant's voice from a recording of the second telephone call placed by "Mr. Marlin" to Iuliano.

25. Dalpe too was an accomplice testifying pursuant to a plea agreement. His testimony about defendant's involvement in the bombing differed from Sadusky's only as to the number of participants in the bombing and the number of trips defendant made to Plaza Auto Clinic on the night of the bombing.

telephone caller, after listening to the recorded telephone conversation. Third, and most important, Sadusky and Dalpe were accomplices testifying pursuant to plea agreements, and the court, mentioning Sadusky and Dalpe by name, specifically instructed the jury as to the weight to be accorded accomplice testimony.[26]

Thus, we conclude that there was no reversible error, either under the "harmless error" standard, *see United States v. Ladd,* 885 F.2d 954, 957 (1st Cir.1989) (error harmless if "it is 'highly probable' that the challenged action did not affect the judgment"); *see also United States v. Hernandez-Bermudez,* 857 F.2d 50, 53 (1st Cir.1988); *United States v. Mazza,* 792 F.2d 1210, 1216–17 (1st Cir.1986), or the "plain error" standard, *see United States v. Lookretis,* 422 F.2d 647, 651 (7th Cir. 1970 ("allegation on appeal that the trial judge improperly conducted voir dire ... will not be heard now, where no objection was made below, in the absence of plain error"); *cf. United States v. Cepeda-Penes,* 577 F.2d 754, 758–59 (1st Cir.1978) (absent manifest injustice, failure to challenge juror during voir dire is waiver of objection to qualifications of juror).[27]

We cannot say in these circumstances that the ambiguity in the voir dire inquiry, or the failure to give a specific instruction, on impeachment by prior conviction resulted in manifest injustice, or affected the fairness, integrity or reputation of the proceedings, *see United States v. Griffin,* 818 F.2d 97, 100 (1st Cir.) (plain errors are "particularly egregious errors that seriously affect the fairness, integrity or public reputation of judicial proceedings"), *cert. denied,* 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987), or, in light of the court's other instructions, that there was any significant risk that it affected the verdict, *see Hernandez-Bermudez,* 857 F.2d at 53 (error harmless where reviewing court finds it " 'highly probable' that the challenged action did not affect the judgment").

## VI. *The Leading Question*

The final claim raised on appeal is that the entire trial was rendered unfair due to the taint left by an unanswered leading question, *see* Fed.R.Evid. 611(c), put to government witness Joseph Dalpe concerning a discussion which occurred at the Plaza Auto Clinic about where the bomb should be placed.[28] Defense counsel

**26.** After instructing the jury to consider "any relation each witness may bear to either side of the case; the manner in which each witness might be affected by the verdict; the presence of bias and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case," the court stated:

> Along these lines, I instruct you to recall the testimony of Joseph Dalpe and Steven Sadusky. They are co-defendants in this case and alleged accomplices of Peter Noone with respect to the evidence about which you have heard. They *previously pleaded guilty and entered into* what we call *plea bargain agreements* with the Government which provided that the prosecutor would recommend to this Court that they receive certain sentences and drop certain charges in return for their truthful testimony. (emphasis added).

The court admonished the jury to scrutinize with "great care and great caution" the testimony of any accomplice testifying pursuant to a plea agreement. *See also supra* at 34.

**27.** At no time during trial did defendant indicate disapproval of the district court's inquiry concerning impeachment by prior conviction. After the court delivered its final jury charge, the defendant, who had not requested such an instruction, simply objected to its absence.

> And finally, your Honor, the Court I don't think instructed on impeachment by conviction of a prior crime as in the case of Iuliano and Sadusky

In not alerting the court that the arguably misleading voir dire inquiry might necessitate a specific instruction on impeachment by use of a prior conviction, it is doubtful that the defendant's objection "enable[d] the court intelligently to appraise the soundness of the position asserted, and if need be, correct the charge to avoid injustice." *United States v. Coady,* 809 F.2d 119, 123 (1st Cir.1987).

**28.** Government counsel's interrogation, in relevant part, was as follows:

> Q. Now, were you having any discussion in the car at that time?
> A. They were discussing which car to put it under.
> Q. Who was discussing it?
> A. Kevin and Steven.
> Q. Was Peter Noone joining in in [sic] that discussion?
> MR. WALKER: I object. This is a leading question, and it is unfair, I would suggest, Your Honor.
> MS. CARMODY: It is a yes or no question. It is not leading.

objected before the witness responded. The court sustained the objection and directed government counsel to rephrase the question.

While the suggestiveness of the challenged question may have lingered, several considerations satisfy us that the trial court did not abuse its discretion by allowing government counsel to rephrase the question and continue with the examination. *See, e.g., United States v. Ranney*, 719 F.2d 1183, 1188 n. 9 (1st Cir.1983) ("Rarely ... will an appellate court interfere with the trial judge's broad discretion to control the mode and order of interrogation under subsection (c) of [Fed.R.Evid. 611].")*; see also United States v. McGovern*, 499 F.2d 1140, 1142 (1st Cir.1974) (broad discretion). First, defense counsel's thorough cross-examination of Dalpe concerning the same subject matter enabled the jury to assess Dalpe's credibility on the issue broached by the unanswered leading question. Second, there was no pattern of leading questions in the interrogation of Dalpe. On the contrary, this was the only leading question put to Dalpe during a lengthy direct examination. Third, any taint left by the leading question did not relate to the placement of the defendant at the scene of the bombing, or in the immediate presence of the other parties to the discussion. Rather, Dalpe testified to those more central matters before the leading question was ever asked. There was no prejudicial error.

*The judgment of the district court is affirmed.*

THE COURT: Rephrase it.
Q. (By Ms. Carmody) Could you tell us again for the Court and jury, Mr. Dalpe, if you know, who was joining in the discussion about where to place the bomb?
A. Everybody was talking.
Q. Including who?
A. There was Kevin, Peter, Steve.

Defense counsel neither objected to the rephrased question, or the response, nor requested other relief. On appeal, however, Noone contends that the entire trial was rendered unfair as a consequence. We consider the claim frivolous, and we discuss it only to elucidate why that is so.